## JONES *v.* STATE

[No. 161, October Term, 1954.]

482

484

*Decided June 22, 1955.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Ellis Levin* and *Hilary W. Gans,* with whom were *Richard H. Lerch* and *Calman A. Levin* on the brief, for the appellant.

*Stedman Prescott, Jr., Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, Anselm Sodaro, State's Attorney for Baltimore City,* and *J. Harold Grady, Deputy State's Attorney,* on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from the conviction of appellant for violation of a Baltimore City ordinance, by two trial judges sitting without a jury.

By Chapter 28, Laws of Maryland, Extraordinary Session, 1948, the Mayor and City Council of Baltimore, (the City), by an enabling act was authorized by the Legislature to issue certificates of indebtedness, the proceeds of which were to be used for the purposes of providing places for storing, parking and servicing self-propelled vehicles, and to create a commission with full power to administer and supervise these expenditures. This commission was known as the Off-Street Parking Commission, (the Commission). Ordinances were adopted by the City to carry out this Enabling Act. In 1948, C. Edward Jones, appellant, was appointed a member of this Commission. He was convicted by the trial Judges on the second count of an indictment charging him with violation of Ordinance No. 94 as codified in Article 1, Section 9, of the Baltimore City Code, 1950 Edition. The essential parts of this Ordinance follow: "It shall not be lawful for any officer of this corporation, * * * to be engaged or concerned, directly or indirectly, in any contract for work done or to be done on account of the city, or in which the city is or may be in any way concerned * * *."

The appellant contends that Ordinance No. 94 is unconstitutional because its title is defective. It is admitted by the State, appellee, that the title of this ordinance, approved May 20, 1890, was defective when originally passed. However, the State contends that this defect was corrected by the subsequent codification thereof and the adoption of the Code of 1892. With this contention we agree. This Ordinance was printed in the Code of 1892 as Section 48 of Article 1. That code was duly adopted and legalized by Ordinance No. 216, dated October 14, 1893, which was titled: "An Ordinance to adopt and legalize the new City Code prepared by John Prentiss Poe." This

486

Ordinance reads as follows: " Sect. 1. Be it enacted and ordained by the Mayor and City Council of Baltimore, That the new City Code, prepared by John Prentiss Poe, containing the Public Local Laws of the State of Maryland relating to the City of Baltimore, and the General Ordinances of the Mayor and City Council of Baltimore in force on the first day of October 1893, be, and the same is hereby approved and adopted." This Ordinance No. 94 of May 20, 1890, has been included in all subsequent codes of Baltimore City as the law of the City. In *State v. Balto. & Ohio R. Co.*, 171 Md. 584, 190 A. 231, the title of Chapter 96 of an act passed in 1910 was defective. By Chapter 790 of the Acts of 1912 the codification of the local laws for Montgomery County was submitted and adopted under the title of "An Act to repeal Article 16 of the Code of Public Local Laws of Maryland, title "Montgomery County', and the several acts and parts of acts amendatory thereof, or inconsistent therewith, and to reenact said Article 16 with amendments under appropriate subtitles." In the codification thus made and enacted Chapter 96 of the Acts of 1910 was included. In answering the contention that the Act was unconstitutional, this Court there said: "In the codification thus made and enacted, chapter 96 of the Acts of 1910 was included. So, as has been recently decided, whatever defects of title may have existed in the prior statute, by reason of a failure in the title to meet the requirements of the Constitution of Maryland, the passage of the Code of Public Local Laws of Montgomery County, with the incorporation of the statute with the defective title, cured the defect in title of the codified statute, as the title of the statute enacting the Code complies with the provisions of section 29 of article 3 of the Constitution of Maryland. *State v. Coblentz,* 167 Md. 523, 526, 175 A. 340; *Dorchester County Commissioners v. Meekins,* 50 Md. 28, 40; *Lankford v. Somerset County,* 73 Md. 105, 108, 20 A. 1017, 22 A. 412; *Garrison v. Hill,* 81 Md. 551, 555, 32 A. 191; *Johnson v. Luers,* 129 Md. 521, 530, 99

A. 710; 59 C. J., secs. 376, 489, pp. 799, 892; 25 R. C. L., sec. 111, p. 867. So, it must be held that sections 846 and 847 of article 16 of the Code of Public Local Laws cannot be held illegal, because of defect of title, since the codification of 1912." See also *Bond v. State*, 78 Md. 523, 28 A. 407. The previous defect in the title was therefore corrected and the Ordinance is valid.

The appellant, as a further argument that Ordinance No. 94 is unconstitutional, contends that it is too vague and fails to fix an ascertainable standard of guilt. With this contention we do not agree. Of course, a duly enacted statute is presumed to be constitutional. *Hammond v. Lancaster*, 194 Md. 462, 71 A. 2d 474; *Shub v. Simpson*, 196 Md. 177, 75 A. 2d 842. Among other cases relied on by the appellant are: *Hoke v. Lawson*, 175 Md. 246, 1 A. 2d 77, where the word "skill" in a statute providing for the licensing of pinball machines was held too indefinite; and *Loughran Co. v. Candy & Tobacco Co.*, 178 Md. 38, 12 A. 2d 201, in which this Court held that the clause "Sales * * * at prices which cannot be justified by existing market conditions * * *" was too indefinite. As contended by the appellant and as stated in *United States v. Cardiff*, 344 U. S. 174, 97 L. Ed. 200, 73 S. St. 189: "Words which are vague and fluid (cf. *United States v. Cohen Grocery Co.*, 255 U. S. 81, 65 L. Ed. 516, 41 S. Ct. 298, 14 A. L. R. 1045) may be as much of a trap for the innocent as the ancient laws of Caligula. We cannot sanction taking a man by the heels for refusing to grant the permission which this Act on its face apparently gave him the right to withhold. That would be making an Act criminal without fair and effective notice." Assuming, as contended by the appellant, that the word "concerned", as here used, is equivalent to the word "interested" (*Philadelphia Sub. Co. v. Penn. P. U. Commission*, 168 Pa. Super. 360, 78 A. 2d 46) we think the statute is definite enough to fix an ascertainable standard of guilt.

In *Foote v. State,* 59 Md. 264, the statute provided a penalty for "any person who shall brutally assault" his wife. This Court held that the term "brutal" was "definite enough to the common apprehension of mankind." In *State v. Magaha,* 182 Md. 122, 32 A. 2d 477, the term "reasonable care" was held to be a degree of care which a person of ordinary prudence would exercise under similar circumstances and established a standard of conduct sufficiently definite to afford an ascertainable test of guilt, and did not violate the due process clause of the Fourteenth Amendment of the Federal Constitution or Article 23 of the Maryland Declaration of Rights. In *Glickfield v. State,* 203 Md. 400, 101 A. 2d. 229, the appellant was convicted of violating a statute which provided that "Any person or persons who shall bribe or attempt to bribe any persons participating in or connected in any way with any athletic contest held in this State shall be deemed guilty of bribery * * *." The statute was attacked on the ground that it was so vague as to violate the constitutional guarantee of due process. It was there held that the words of the statute must be accorded the meaning naturally given them in ordinary usage, that a person of ordinary intelligence reading that statute would not be in doubt as to the nature of the acts condemned, and that a conviction under that statute would protect the defendant from a subsequent prosecution for the same offense.

In *Black's Law Dictionary,* 3rd Ed., 1944, in which definitions are given with cases cited, the word "directly" is defined as "In a direct way without anything intervening; not by secondary, but by direct; means," and the word "indirectly" is defined as "A term almost always used in law in opposition to 'direct,' though not the only antithesis of the latter word, as the terms 'collateral' and 'cross' are sometimes used in contrast with 'direct.'" In *Webster's New International Dictionary,* 2nd Ed., the word "indirectly" is defined as "remotely connected with." *Black* defines the word "concerned"

as "Relating to; pertaining to; affecting; involving; being substantially engaged in or taking part in." The meaning of these words are certainly understood by persons of ordinary intelligence. Two Connecticut cases, cited by the appellee, are very helpful on this question. In *State v. Zazzaro*, (1941), 128 Conn. 160, 20 A. 2d 737, the statute forbade a stockholder of a corporation manufacturing or wholesaling alcoholic liquor to "lend money or otherwise extend credit directly or indirectly to any permittee holding a retail liquor permit." It was contended that these words were so vague and uncertain as to make the statute unconstitutional. It was there said in holding the section constitutional as not violative of the due process clause: "We fail to discover anything arbitrary or unreasonable in this. The prohibition has direct and rational relation to its purpose. The test of certainty in a criminal statute is discussed in *State v. Andrews*, 108 Conn. 209, 213, 142 A. 840, 841, where it is said that such statutes will not be held void for uncertainty 'if any practical or sensible effect may be given to them.' Such effect is plainly apparent in the present case." In *State v. Genova*, (Conn., 1954), 107 A. 2d 837, the statute prohibited selling or exchanging or being "concerned" in selling or exchanging policy tickets. It was there said: "The wording of the statute is sufficiently broad to encompass not only the actual act of selling or exchanging some tangible object in the form of a slip or a ticket but also being 'concerned' with selling or exchanging it. See *State v. Mola*, 128 Conn. 407, 409, 23 A. 2d 126. One is concerned in a certain matter when he has some connection with it, when it affects his interests or involves him. Then, too, one is 'engaged' in an affair when he is involved with it or has some interest in it. *Webster's New International Dictionary* (2d Ed.). The intent expressed by the statute is to make one who participates, is involved or has an interest in the acts proscribed subject to the penalties set forth. * * * It is sheer indulgence in the technicality of ancient

common-law pleading, where the great number of crimes punishable on the gibbet made it necessary to resort to fine-spun reasoning to save the neck of the victim, to say that an information which charges that an accused 'did engage' in doing a prohibited act is not comprehended by a statute which forbids being 'concerned' in doing it."

The appellant further contends that his acts do not come within the purview of the ordinance. The testimony shows that the appellant has been engaged for many years in the general practice of law in Baltimore City. He was appointed a member of the Commission in 1948 and continued thereon until October, 1953. While a member of the Commission, about September 22, 1950, he was employed by Albert Haar and Samuel Winik, who were engaged in the automobile parking business, to reorganize their business interests, to effect proper estate planning and to effect tax savings. In the process of so doing, appellant formed some four or five different corporations and also brought up to date the records of Haar-Win Parking Co., Inc., an old corporation under which Haar and Winik had been operating up to that time. Among the new corporations thereby formed by him for Haar and Winik were Baltimore Garages, Inc., and Charles Street Garage, Inc. On August 10, 1950, Haar and Winik, as individuals, filed an application with the Commission for a loan to buy land and build an off-street parking garage thereon. On the recommendation of the Commission, of which the appellant was then a member, the City granted a loan to Baltimore Garages, Inc., by an agreement dated January 17, 1951. The minutes of this corporation, which the appellant had helped prepare, showed that this contract was taken in the name of Baltimore Garages, Inc., formed for Haar and Winik by appellant, rather than in the names of Haar and Winik, who had made the application as individuals. Appellant testified that this was done for tax purposes. Construction was begun on this contract

in April, 1951, and completed in March or April, 1952, and the loans were advanced by the City during that period.

On June 7, 1951, Charles Street Garages, Inc., which the appellant had formed, made application to the Commission for a loan for an off-street parking garage. At that time the appellant was counsel for the corporation and for the individuals, who were controlling stockholders and the principal officers of that corporation. The appellant was also at that time a member of the Commission. On September 27, 1951, the contract with Charles Street Garage, Inc., was approved by the Commission. The City thereupon made a loan to it. This contract was later modified by an agreement dated October 10, 1952. It was shown at the trial that the usual policy of the Commission is to require that any party receiving a loan put up in advance fifteen percent of the cost of construction. However, the Commission was advised by a letter dated April 24, 1951, that Baltimore Garages, Inc., was not financially able to put up this fifteen percent in advance and a request was made for permission to do this in installments rather than in a lump sum. The Commission, of which the appellant was a member, at a meeting at which appellant indicated he was present, permitted this exception from the usual procedure with the definite statement that it was not to be considered as a precedent. Appellant was asked the question: "You knew maybe there were other members on the Commission who may have had friends or clients that may have been interested, but didn't they excuse themselves from considering their projects?" He answered: "I don't recall that until just lately, sir."

The law firm, of which appellant was a member, also represented Haar and Winik and some of their corporations in some other cases such as the demolition of a wall and damages to an automobile. For his services appellant was to receive a fee in the amount of $6,000.00 for the incorporation of the four or five companies, for

bringing the old corporation up to date, for the estate planning, and for personal advice as to the tax situation of Haar and Winik individually. This fee was to be paid over a period of three years at the rate of $2,000.00 per year. Appellant received for other services rendered by his office fees of approximately $450.00. All of these fees were paid between October, 1950, and May, 1953. The checks, given in payment for the advice, were not made payable to the appellant but to another lawyer whose offices adjoined that of appellant. Appellant admitted that all of these fees were received in the account of his law firm. This was done by endorsement of the checks. Sums were advanced by the City on construction work to Charles Street Garage, Inc., as late as June 10, 1953. Appellant did not reveal to any of the officers of the City or to the other members of the Commission that Haar or Winik or any of their corporations were his clients until spring or early summer of 1953, long after the loans were granted and work had started on the construction of the garages and payments had been made.

As to appellant's contention that his acts recited above did not come within the purview of the ordinance, there is no doubt that he was a member of the Commission during the time the contracts were awarded, the garages were being constructed, and while payments were being made to Haar and Winik and their corporations. The question before us is, therefore, whether the appellant was engaged or concerned directly or indirectly in these contracts. Appellant contends that to so find, it must be shown that he had a pecuniary or proprietary interest in these contracts and relies on the following authorities, among others: 2 *Dillon on Municipal Corporations*, (5th Ed.), Sec. 773; 10 *McQuillin on Municipal Corporations*, (3rd Ed.), Sec. 29.97, page 390; *Commonwealth v. Albert*, (Mass., 1940), 29 N. E. 2d 817; *Mumma v. Town of Brewester*, (Wash., 1933), 24 P. 2d 438; *State v. Kuehnle*, (N. J., 1913), 88 A. 1085; *County Commissioners for*

*Charles County v. Wilmer,* 131 Md. 175, 101 A. 686; *Wilson v. City of New Castle,* (Pa., 1930), 152 A. 102; *Ex Parte Bowles,* 164 Md. 318, 165 A. 169; *Gordy v. Dennis,* 176 Md. 106, 5 A. 2d 69. For the purposes of this case we will concede appellant's argument in this regard and consider whether the appellant had a pecuniary interest in the contracts.

In contending that he had no pecuniary interest in these contracts, appellant relies strongly on the case of *People v. Stoll,* (1926), 242 N. Y. 453, 152 N. E. 259. In that case the defendant was a member of a town board and also a member of a firm appointed counsel to the commissioners of the water district. The acts of the defendant were known to the public and were evidenced by public records. He took no part in any vote concerning the water district. He was not present or within the state at the time of the meeting when the bonds were awarded and took no part in the fixing or auditing of the amount to be paid to the commissioners for their services. It was there held that the defendant was not in the employment of the town and that the contract was not such a contract within the penal statute. That case does not seem helpful to the appellant here. However, the following quotation from that case seems to sustain the position of the appellee here: "The fact that the defendant did not participate in formal proceedings taken by the town board or cast a vote in any matter affecting the water supply district is irrelevant on this prosecution, and does not under the terms of the statute, exempt the defendant from criminal liability, if the action taken by the town board constituted a contract, sale, or lease within the meaning of the statute and the defendant voluntarily became interested therein. He is not charged with making a corrupt bargain or receiving a gratuity intended to influence his official action. The prohibition of section 1868 of the Penal Law is directed against such acts which might reasonably tend to introduce into the performance by a public

officer of his official duties considerations of possible private interest rather than against the performance of official acts corruptly. It prohibits a public officer from voluntarily putting himself into a position where he might be tempted to degrade his public trust to serve his private interests, even though it should appear that the public officer did not in fact yield to the temptation. The defendant 'cannot put on and off the garb of a public official, and discharge or refuse to discharge the duties of his trust at will, and as best subserves his private interests.' *Beebe v. Supervisors of Sullivan County*, 64 Hun. 377, 19 N. Y. S. 629, affirmed, on opinion below, 142 N. Y. 631, 37 N. E. 566. Indeed, where a public officer voluntarily places himself in a position which tends in any way to limit his usefulness to the public in the office he has accepted, the propriety of his conduct may be questioned, even though not prohibited by law. We are not now considering, however, the propriety of the defendant's conduct, but whether it was forbidden by the Penal Law. Moreover, it is fair to the defendant to point out that in large part the functions of the town board in relation to the water supply district created by it are administrative and even mandatory in their nature, and involve no discretion (*Holroyd v. Town of Indian Lake, supra,* [180 N. Y. 318, 73 N. E. 36]), and services honestly and efficiently performed by the defendant as counsel for the water commissioners could hardly seriously interfere with the performance of defendant's duties as a member of the town board, and might serve to safeguard the interests of the property owners of the town." In *State v. Kuehnle, supra,* relied on by the appellant, it was said: "The statute makes the offense a crime if he is directly or indirectly concerned, which is only a longer way of saying, if he is concerned at all. It can make no difference whether the concern is direct or indirect, and the adjectives might well be omitted. * * * We think, therefore, that the material averment is the averment that the defendant was

corruptly interested and concerned, and that the averment of a direct concern may be disregarded, since the facts specifically set out to show a concern as stockholder of the United Paving Company. We see no reason to doubt that such a concern may in a proper case be sufficient to bring the defendant within the statute."

In *Lennox & Matthews & Associates v. Rozelle*, (Ind., 1952), 104 N. E. 2d 409, the statute made it an offense for any state officer to bargain for or receive any profit whatever on any contract in which the state, county or town were concerned. It was said in that case: "Nor is it necessary to show that any evil was in fact done by or through the contract. The purpose of the rule is to prevent persons from assuming a position where selfish motives may impel them to sacrifice the public good to private benefit." In *People v. Deysher*, (Cal., 1934), 40 P. 2d 259, Deysher was convicted of being interested, while a supervisor, in certain contracts for the improvement of county roads. While he was supervisor of roads he was an equal partner in a co-partnership which was engaged in renting road machinery. The California code provided: "No member of the board of supervisors must be interested, directly or indirectly * * * in any contract made by the board, or other person, on behalf of the county, for * * * the * * * improvement of roads. * * *" The defendant contracted with a particular corporation to improve roads. That corporation later rented road equipment from the partnership in which the defendant was a partner and paid rent therefor. In *Beakley v. City of Bremerton*, (Wash., 1940), 105 P. 2d 40, the city attorney employed his wife to do stenographic work and to be paid by the city. Under the community property law the husband had an interest in the wages received by her. The statute prohibited an officer from being "interested directly or indirectly" in any contract with the city. It was held that the husband and wife could not recover the balance of the wife's unpaid salary and the city could recover the

amount paid the wife. In *People v. Elliott*, (Cal., 1953), 252 P. 2d 661, the defendant was convicted of wilful and corrupt misconduct in office because he was a member of the Board of Education of Los Angeles City at the time it entered into nine contracts with the Landier Management Company to provide bus transportation for pupils of the school district. He voted as a member of the board to approve each of these contracts. At the time of the first contract he was attorney for F. P. Landier and at the time each of the succeeding eight contracts were entered into he was attorney for the Landier Management Company, Landier and the Landier interests. He was on a monthly retainer of $200.00 payable each month by the Landier Management Company. Each of the contracts required that the company carry public liability and property damage insurance. In connection with this insurance the president of the company and Mr. Landier met with the defendant in his office to discuss these insurance problems and several meetings were held with the defendant in connection with these insurance problems. He also gave advice concerning the financial difficulties of one of the employees, a school bus driver. During the time defendant was voting on each of the contracts, when they were approved by the board, he made no disclosure of his relationship with the Landier Management Company to any of the school board members. In affirming the conviction of the defendant, it was said: "It is established that the unlawful interest of a public officer in a public contract which is prohibited, is a 'personal interest which might interfere with the unbiased discharge of his duty to the public or prevent his exercise of absolute loyalty and undivided allegiance to the best interest of the [government unit which he represents.]' * * * It was therefore to defendant's interest to have the board continue to award contracts to the Landier Management Company. As long as this business continued he was assured his retainer agreement would be continued, not only with the Man-

agement Company but also with Mr. Landier personally, since the latter benefited not only because he was a principal creditor of the Management Company and received payments on account of it, but also because he personally gained by reason of his commission agreements with the company. The more business the Management Company got, the greater its need for legal services and the more likelihood of its continuing to retain defendant."

The evidence here clearly shows that, during the time the appellant was a member of the Commission, he approved contracts with Haar and Winik and their corporations which he had formed. He was being paid fees by Haar and Winik and their corporations during this period. He did not reveal to any of the other members of the Commission the fact that he was the attorney for these contracting parties. It is also significant that the checks paying appellant's fees were not payable to him but to another attorney and were endorsed to appellant's law firm. As in *People v. Elliott, supra,* the more contracts Haar and Winik and their corporations received, the greater their need would be for legal services and the more likelihood there would be of appellant continuing as their attorney and the more likelihood that they would be in a position to pay the fees they had contracted to pay appellant. We are of opinion that the appellant's acts were forbidden by the provisions of the Ordinance.

The appellant further contends that the prosecution is barred by the Statute of Limitations. The offense charged being a misdemeanor, it is subject to a one year period of limitation. Code, 1951, Article 57, Section 11. As above stated, the appellant became a member of the Commission in 1948 and continued thereon until October, 1953. He was employed by Haar and Winik in September, 1950. The contracts were approved prior to October 30, 1952, and the indictment was not brought until October 30, 1953, which was more than one year after the contracts were approved. The appellant con-

tends that because the prosecution was not begun within a year from the time of the approval of the contracts, limitations bar the action. However, the duties of the Commission included not only the approval of loans but also other duties. The Enabling Act, Chapter 28, *supra,* in Section 3, provides that the City shall create the Commission with full power to administer and supervise the proceeds derived from the sale of the certificates of indebtedness, including but not limited to the expenditures and disposition thereof. The Commission was to be given authority to employ, among other persons, consulting, planning or designing engineers, architects or other persons possessing technical or specialized skills in connection with the duties and powers of the agency. Section 4 provides in part that "no part of the proceeds of the certificates of indebtedness * * * shall be expended until after the agency * * * has submitted its written recommendation, which shall set forth the purposes for, and the terms and conditions upon, which each particular sum of money is to be expended." Chapter 611 of the Acts of 1947 gives the power to the City to "acquire * * * maintain, operate, control and regulate buildings, * * * for storing, parking and servicing self-propelled vehicles." Ordinance 338 and Section 6, Subsection 18(A) of the Baltimore City Charter give the Commission all powers granted by the Enabling Acts aforesaid. Payments were made by the City to the Charles Street Garage, Inc., for construction as late as June 10, 1953. Payments of principal and interest to the City were made during the period from the time contracts were approved and as late as June 10, 1953. The duties of the Commission were also to supervise the expenditures and disposition of the monies received from the certificates of indebtedness. The payments were to be made in installments. Some of these installments were paid as late as June 10, 1953, with the approval of the Commission of which appellant was a member. This was well within one year before the date of the indict-

ment. In *Scarlett v. State,* 201 Md. 310, 93 A. 2d 753, where the defense of limitation was raised under a charge of conspiracy to violate the lottery laws, it was held that continuous cooperation constituted a single conspiracy. See also *Adams v. State,* 202 Md. 455, 97 A. 2d 281; *State v. Ireland,* 126 N. J. L. 444, 20 A. 2d 69; *State v. Weleck,* 10 N. J. 355, 91 A. 2d 751. The duties of the appellant as a member of the Commission being more than the mere approval of the contracts, we are of opinion that the trial judges were correct in ruling that the Statute of Limitations did not here apply.

Appellant further contends that, because of irregularities in the Grand Jury Proceedings, the indictment should have been dismissed and the court should have permitted inquiry of witnesses including members of the Grand Jury regarding this question. These questions were raised and argued in *Dominic Piracci v. State* and *Dominic Piracci, Piracci Construction Co., Inc. v. State,* 207 Md. 499, 115 A. 2d 262. For the reasons stated in those opinions, this day filed, we are of opinion that the action of the trial judges on these matters was correct.

The judgment will be affirmed.

*Judgment affirmed, with costs.*